**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA <br> U.S. Department of Justice <br> Antitrust Division <br> 450 Fifth Street NW, Suite 7100 <br> Washington, DC 20530, <br><br> *Plaintiff,* <br><br> v. <br><br> COX ENTERPRISES, INC. <br> 6205 Peachtree Dunwoody Road <br> Atlanta, GA 30328, <br><br> COX AUTOMOTIVE, INC. <br> 3003 Summit Blvd., Suite 200 <br> Atlanta, GA 30319, <br><br> and <br><br> DEALERTRACK TECHNOLOGIES, INC. <br> 1111 Marcus Ave, Suite M04 <br> Lake Success, NY 11042, <br><br> *Defendants.* | Case No. <br><br> Judge: <br><br> Description: Antitrust <br><br> Filed: September 29, 2015 |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to enjoin the proposed acquisition by Defendants Cox Enterprises, Inc. and Cox Automotive, Inc. (collectively, "Cox") of Defendant Dealertrack Technologies, Inc. ("Dealertrack"). The United States alleges as follows:

## I.    NATURE OF THE ACTION

1.    Cox intends to acquire all of the outstanding shares of common stock of Dealertrack through a cash tender offer totaling approximately $4 billion. Cox and Dealertrack are both leading providers of automated solutions and marketing services to the automotive

industry, and are significant direct competitors in the development, marketing, and sale of inventory management solutions ("IMSs") to automotive dealerships in the United States.

2.     Cox and Dealertrack are the two leading providers of full-featured IMSs that are employed primarily for inventory management in the used vehicle businesses of larger automotive dealerships, particularly those that operate franchises associated with new vehicle original equipment manufacturers ("OEMs").  The IMSs of Cox and Dealertrack participate in a market with only four significant competitors.  The two firms compete head-to-head in the development, marketing, and sale of their respective IMSs.  Cox's proposed acquisition of Dealertrack would eliminate this competition, resulting in higher prices and lower quality for dealership consumers.

3.     Accordingly, the transaction is likely to substantially lessen competition in the provision of full-featured IMSs in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

4.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject-matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

5.     Defendants market, sell, operate, and service their products, including their IMSs, throughout the United States and regularly and continuously transact business and transmit data in connection with these activities in the flow of interstate commerce, which has a substantial effect upon interstate commerce.

6.     Defendants consent to personal jurisdiction and venue in this district.  This Court has personal jurisdiction over each Defendant and venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).

### III.     DEFENDANTS AND THE PROPOSED ACQUISITION

7.     Cox Enterprises, Inc., and its subsidiary, Cox Automotive, Inc., are both Delaware corporations headquartered in Atlanta, Georgia.  Cox develops and sells a diverse portfolio of automated solutions and services for automotive dealers and consumers, including vAuto, a full-featured IMS.  The total annual net revenue of Cox's automotive businesses in 2014 was approximately $4.9 billion.  Its U.S. IMS revenue was a relatively small part of its total revenue.

8.     Dealertrack Technologies, Inc. is a Delaware corporation headquartered in Lake Success, New York.  Dealertrack develops and sells a variety of automated solutions and services for automotive dealers, including Inventory+, a full-featured IMS that combines the functionality from two IMSs that Dealertrack acquired – AAX and eCarList.  Dealertrack's total annual net revenue in 2014 was approximately $854 million.  Its U.S. IMS revenue was a relatively small part of its total revenue.  Dealertrack also owns a 50% interest in Chrome Data Solutions, LP ("Chrome"), a company that compiles and licenses vehicle information data.  The remaining 50% interest in Chrome is owned by Autodata Solutions, Inc. and Autodata Solutions Company (collectively, "Autodata").

9.     On June 12, 2015, Cox Automotive and Dealertrack entered into an Agreement and Plan of Merger whereby Cox agreed to commence a cash tender offer to acquire all of the outstanding shares of Dealertrack for $63.25 per share, for a total of approximately $4 billion.

## IV. <u>THE RELEVANT MARKET</u>

### A. Industry Background

10.     In the United States, new and used vehicles are typically sold to consumers through automotive dealerships.  A dealership may be "franchised," meaning it is associated with an OEM, or "independent" of any association with an OEM.  New vehicles are acquired by franchised dealers directly from OEMs and resold to consumers.  Used vehicles are purchased or otherwise acquired (often through trade-ins) by franchised or independent dealers and then sold to consumers or at wholesale (often at auction).  A dealer may have more than one physical store (or "rooftop") and franchised dealers may be associated with more than one OEM.  The type of automated products and services that a dealer uses to manage its business often depends on its size, its level of sophistication, and whether it is franchised or independent.

11.     Most franchised and larger independent dealers rely on dealer management systems ("DMSs") to manage the primary functions of their businesses, including sales, finance, accounting, service, parts, and personnel.  The DMS is the central repository for a large amount of data about the dealer's day-to-day business activities.  IMSs are a type of "point" solution that offer enhanced functionality that is not provided in the DMS.  IMSs communicate and share data with the dealer's DMS and other point solutions.

12.     Full-featured IMSs traditionally have been used to assist dealers in managing their used vehicle inventories, although the leading IMSs increasingly offer extended functionality to manage new vehicle inventories.  A full-featured IMS uses algorithms and sophisticated analytics to help dealers: (1) optimize their inventories; (2) appraise the value of vehicles they want to acquire; (3) set prices for vehicles they want to sell; (4) publish listings of vehicles that they have for sale; and (5) run detailed reports and analytics on vehicle and dealership performance relative to other vehicles and dealerships.  This combination of automated analytics,

reporting, optimization, pricing, and merchandising enables dealers using full-featured IMSs to operate their businesses more efficiently and to increase the rate at which they sell vehicles ("inventory turns") and their overall profitability.

13.     To perform the functionality described above, a full-featured IMS must be able to exchange data and communicate with other automated solutions.  The performance and competitive viability of a full-featured IMS depends on the breadth and quality of its data.

14.     A full-featured IMS obtains data about the dealer's current inventory and vehicle sales history from its DMS and provides the DMS with new or updated information, such as new or changed vehicle prices.  A full-featured IMS collects a large amount of wholesale and retail pricing data, which may include data from auction services, book value guides, vehicle history reports, and online listings.  It may also collect indicators of consumer interest in a particular vehicle, such as click data relating to consumers' online browsing activities.  Further, a full-featured IMS prepares and distributes vehicle listings to the dealer's website and third-party vehicle retail sites.

15.     Defendants own or otherwise control access to many of the most important data sources and destinations for full-featured IMSs.  Cox's Manheim Market Report is the most comprehensive and widely used source of data from auction services.  With AutoTrader, Cox controls the leading online solution for buying and selling new and used vehicles.  With Kelly Blue Book, Cox controls the most widely used consumer-facing book value guide.  With Dealer.com, Dealertrack manages the majority of franchised dealer websites.  With its DMS, Dealertrack manages inventory and transaction data for a significant number of franchised dealers.  As described above, Dealertrack also owns 50% of Chrome, which is the primary

source of vehicle-specific data relied upon by full-featured IMSs, DMSs, and many other point solutions and websites.

16.     To operate efficiently, a full-featured IMS must access and be able to transmit and receive data about specific vehicles with other automated solutions.  This vehicle-specific data includes, but is much broader than, information about the year, make, model, engine, plant location, and country of origin of a vehicle that is encoded in the 17-digit vehicle identification number ("VIN").  A full-featured IMS also relies on many additional categories of vehicle-specific data, such as editorial content, stock images, stock videos, ordering guide pricing data, OEM features and specifications data, configuration data, factory service schedule data, accessories data, warranty information, OEM new vehicle rebates and incentives data, and OEM build data (the "as built" equipment manifest and pricing data).  Chrome is the leading provider of this vehicle-specific information, and Chrome offers significantly more vehicle data than any other supplier.

17.     Every full-featured IMS relies on Chrome data, as do most other automotive solutions and websites with which IMSs exchange vehicle data.  Chrome has become a *de facto* standard that these solutions and websites employ to enable the efficient exchange of information about specific vehicles.  Incorporation of Chrome data into most major automotive solutions has resulted in significant network efficiencies.

**B.     Relevant Product Market**

18.     A hypothetical monopolist of full-featured IMSs profitably could increase its prices by at least a small but significant and non-transitory amount.  Full-featured IMSs are most frequently used by large franchised and independent dealers.  These dealers generally have larger information technology budgets, make more decisions centrally, and have more complex

operating requirements than smaller dealers due to larger vehicle inventories, higher inventory turns, and more rooftops.  They are therefore more dependent on robust, integrated automated solutions to effectively manage their businesses.  Although some other solutions offer dealers certain aspects of inventory management functionality, they are less comprehensive and less robust than full-featured IMSs.  These solutions are used primarily by smaller dealers and are not meaningful alternatives to full-featured IMSs.  Accordingly, full-featured IMSs constitute a relevant product market and line of commerce for purposes of analyzing the likely competitive effects of the proposed acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### C.    Relevant Geographic Market

19.    Defendants market and sell IMSs to dealerships located across the United States, and customers do not differentiate between IMSs on the basis of location.  A hypothetical monopolist of full-featured IMSs profitably could increase its prices to dealers in the United States by a small but significant and non-transitory amount.  Accordingly, the United States is a relevant geographic market for purposes of analyzing the likely competitive effects of the proposed acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### V.    ANTICOMPETITIVE EFFECTS OF THE PROPOSED ACQUISITION

20.    Cox and Dealertrack are the two leading providers of full-featured IMSs.  Cox is the market leader, with a market share of approximately 60%.  Dealertrack is the second leading provider with a market share of approximately 26%.  Cox's proposed acquisition of Dealertrack would enable the merged firm to control approximately 86% of full-featured IMS sales.

21.    Market concentration is often a useful indicator of the level of competitive vigor in a market and the likely competitive effects of a merger.  The more concentrated a market, and the more a transaction would increase that concentration, the more likely it is that the transaction would result in reduced competition, harming consumers.  Market concentration commonly is

7

measured by the Herfindahl-Hirschman Index ("HHI"), as discussed in Appendix A.  Markets in which the HHI exceeds 2,500 points are considered highly concentrated, and transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power.  Here, the proposed acquisition would substantially increase market concentration in a highly concentrated market, raising the HHI by approximately 3120 points to a post-acquisition HHI of approximately 7526 points.

22.     Cox and Dealertrack currently compete head-to-head and their IMSs are close substitutes.  Cox's proposed acquisition of Dealertrack would eliminate this competition and further concentrate a market that is already highly concentrated.  As a result, Cox would emerge as the clearly dominant provider of full-featured IMSs with the ability to exercise substantial market power, thereby increasing the likelihood that Cox could unilaterally increase prices or reduce its investment or other efforts to improve the quality of its products and services. Moreover, with the acquisition of Dealertrack, Cox would acquire an ownership interest in Chrome that could enable Cox to deny or restrict access to Chrome data and thereby unilaterally undermine the competitive viability of Cox's remaining IMS competitors.

## VI.  ABSENCE OF COUNTERVAILING FACTORS

23.     It is unlikely that any firm would enter the relevant product and geographic markets alleged herein in a timely manner sufficient to defeat the likely anticompetitive effects of the proposed acquisition.  Successful entry in the development, marketing, operation, and sale of a full-featured IMS to dealers in the United States is difficult, time-consuming, and costly.

24.     Any new entrant would be required to expend significant time and capital to design and develop an automated solution with functionality that is at least comparable to the Defendants' full-featured IMSs, including developing robust algorithms that could accurately source, price, and market a dealer's vehicles.  Successful entry would also require a substantial

effort in identifying and obtaining access to the data sources necessary to power the IMS algorithms, and significant payments for such data and for access to the interfaces necessary to allow the IMS to work with a dealer's DMS and other automated solutions.  In particular, it is unlikely that any such effort would produce an economically viable alternative to Chrome data in the near future.

## VII.   VIOLATION ALLEGED

25.     The United States incorporates the allegations of paragraphs 1 through 24 above.

26.     The proposed acquisition of Dealertrack by Cox is likely to substantially lessen competition for full-featured IMSs in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

27.     Unless enjoined, the proposed acquisition likely will have the following anticompetitive effects, among others:

(a)     actual and potential competition between Cox and Dealertrack in the development, marketing, and sale of IMSs in the United States will be eliminated;

(b)      competition in the development, marketing, and sale of IMSs in general will be substantially lessened;

(c)     prices of IMSs will increase;

(d)     improvements or upgrades to the quality or functionality of IMSs will be less frequent and less substantial; and

(e)     the quality of service for IMSs will decline.

## VIII.   <u>REQUEST FOR RELIEF</u>

28.     The United States requests that this Court:

(a)     adjudge and decree that Cox's proposed acquisition of Dealertrack would be unlawful and would violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     permanently enjoin and restrain Defendants and all persons acting on their behalf from carrying out the Agreement and Plan of Merger dated June 12, 2015, or from entering into or carrying out any other contract, agreement, plan, or understanding to combine Cox with Dealertrack;

(c)     award the United States its costs for this action; and

(d)     award the United States such other and further relief as this Court deems just and proper.


Dated: September 29, 2015

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
William J. Baer (D.C. Bar #324723)
Assistant Attorney General for Antitrust

_____
Renata B. Hesse (D.C. Bar #466107)
Deputy Assistant Attorney General

_____
Patricia A. Brink
Director of Civil Enforcement

_____
James J. Tierney (D.C. Bar #434610)
Chief, Networks & Technology
Enforcement Section

_____
Aaron Hoag
Matthew Hammond
Assistant Chiefs, Networks & Technology
Enforcement Section

_____
Ian D. Hoffman
Kent Brown
John C. Filippini (D.C. Bar #165159)
Patricia L. Sindel (D.C. Bar #997505)
Trial Attorneys, Networks & Technology
Enforcement Section

Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Phone: (202) 598-2456
Facsimile: (202) 616-8544
E-mail: ian.hoffman@atr.usdoj.gov

## APPENDIX A

### *Herfindahl-Hirschman Index*

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the relevant market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated. *See* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 5.3 (2010) ("Guidelines"). Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the Guidelines. *Id.*